So we're ready for argument in our Blue Frame Medical LLC v. Chain Bridge, N.L. case. Mr. Citron. May it please the Court, the District Court's core legal holding in this case cannot be safely affirmed. What the District Court held is that neither state law nor Section 204 of Regulation J prohibits a bank from knowingly wiring money out of its own customer's account without that customer's authorization and indeed without any basis in law for debiting the customer's account. That cannot be right. That would open a glaring loophole in the center of federal wire transfer regulations. What I think Chain Bridge is hoping is that in a case of first impression, this Court would be willing to do violence to those regulations in order to make sure that a plaintiff that it hopes you won't like won't recover. But while most of the things it says about my client are either manifestly untrue or at least hotly disputed, the truth is it doesn't matter. The damage will have been done because Chain Bridge offers no plausible legal basis for distinguishing this case from the next one in which a bank decides on its own initiative that its customer's money belongs elsewhere. And if the Court has any questions about that, I'd really like to answer them and talk through them because I think the stakes of this issue are really, really high for federal banking law. But if the Court doesn't have questions about that, what I'd really like to talk about is the Court's second holding, which is that we don't have any damages at all. I guess I'll bite. I have a question. I'm a big concern. I mean, it does strike me that part of the answer probably lies in preemption and that the remedy that you were looking for would come under state law. And what's weird about this case is that the preemption holding is a little bit underdeveloped. And I think one of the reasons it's underdeveloped is because it kind of looks like Blue Flame's trial lawyer got up at that hearing and was kind of like, we're on the same page as you. Everybody sort of agrees. Most of these claims are preempted, but not tortious interference and not defamation. And the district court even says, I agree with you. Those are the ones that are not preempted. And then that's that. And I'm not saying it was conceded, but the way the hearing went, there was no occasion to really talk much about preemption because everybody seemed to be more or less on the same page. And it just strikes me that the answer to your concern, where a bank literally just wires the money out of, say, my account, puts it in the bank president's account instead, is I'm probably going to have a state law cause of action. That's no longer about sort of the wire transfer process, the process by which one bank wires money to another at the request of the originating institution. That's what's covered by Regulation J. But I think under our cases like LaCouvia, we would just say, that's just a conversion action. Have at it under state law. Well, I do agree that there is a conversion claim or potentially a fraud claim insofar as, you know, Chainbridge Bank purported to drop its own payment order, naming us as the originator. That is a false record. We didn't originate it. They know we didn't originate it. In fact, they now say that we didn't originate it. And it is possible that the better formulation of the claim sounds in state law. But I do think this is actually covered quite squarely by Regulation J. You know, I think what the bank purported to do, if you look at page 22 of our opening brief, is that Chainbridge purported to accept a payment order issued in our name as sender because it says that we're the originator of the original payment order. And the way that you would This is the payment that goes back to J.P. Morgan we're talking about. That's right. We're talking about the return payment out of our account, which was not authorized conceitedly. And what I think that record is, is evidence of both the acceptance of a payment order issued in our name and the execution of the second payment order. There's two payment orders in every transfer. If I'm the originator, there's my order to my bank to pay the money on, and then that bank issues its own payment order telling the beneficiary's bank to pay the beneficiary. But that outgoing payment order record is going to look the same as the acceptance of the first payment order and issuance of the second payment order. Which one do you say is the outgoing payment order? It's confusing because there are technically four payment orders. There are two for the one that went from California to us, and then there's two for the one that came out of our account and went to California. What I'm saying is the record at Chain Bridge Bank of this transaction is going to be the same for the two payment orders involved because it's going to show us as the originator and California as the beneficiary on both of them, and that's how they would record that they received a payment order. Why does that make a difference? They contest that that's a – I guess their theory is that they didn't even purport to accept a payment order issued in our name as sender, that they did something worse, which was just wire money out of our account without any basis in law whatsoever, and that that's not covered by the regulation, I guess because it's extra bad or something like that. But I think the regulation actually does squarely cover that because what they are doing when they send money out of our account, when they purport to debit our account, is they are purporting to accept a payment order issued in our name. And the regulation is just unambiguously clear about what happens when you do that and the payment wasn't authorized. You have to return the money to us and pay daily interest. And I just want to cover off what I think is one possible concern, which is that this is going to result in a $450 million windfall to my client or something like that. That's not going to happen. The regulation says that whoever is stuck with indemnification in this case, it's not clear yet. JPM is appealing the indemnification holding and also suing California for indemnification. Whoever is stuck with indemnification is going to have a claim against us. Did you ask for the $470 million back? Yes, we did. In your complaint? Yes, it is in our complaint unambiguously with respect to Section 204A. There's a dispute about whether we asked about it for Section 404A. That's our separate claim. Do you think in your complaint you did ask for that under 404A? I didn't actually realize that was disputed. I think if you look at page 90, I'll grab it. It's JA40, paragraphs 92 and 99. We say that there was an obligation to pay the money under Section 404A and that the consequential damages are among the harms that we suffered. I thought you asked for the – okay. So we say the consequential damages are among the harms, but we don't say we're limiting our claim to the consequential damages. I think it's not – we didn't do a great job. And part of that is because the damages are overlapping. I just want to make sure I get to – Hold on a second. I'm sorry. Can you just explain procedurally your understanding of where the case was at the time of the decision, particularly on your issue about consequential damages? I read your papers to suggest there are a number of factual issues you feel are in dispute about whether or not there were damages in this case. Also hearing you now suggesting some differences in views about the facts on your other argument. Procedurally, where was the case? What was the information and evidence before the court in deciding particularly the issue of damages? Sure. I think there's a lot of hotly disputed evidence about the extent of our damages before the court. And that's particularly true with respect to the first 6 million masks, which were going to come from a supplier in New Jersey called Suchi. As to that evidence, really the record is quite one-sided in our favor. All the testimony about those masks and our ability to deliver them says that we were going – they were available for shipping out the very next day. They were in Suchi's live inventory. And the other side really has no evidence whatsoever with respect to those masks. So, you know, it's damages – and we're talking about a hypothetical world that doesn't exist because of the misconduct alleged. So it's the kind of thing that's difficult. No side is going to have direct evidence of an alternative universe. But this is what we count on juries for. We have lots of reasons to suspect that had they not done the wrong thing, we would have gotten a chance to perform and we would have made our profit margin in this case. And also, you know, we would have been able to make our profit margin on other transactions if our reputation and access to capital hadn't been destroyed. They have a contrary story. This is exactly what a jury trial is for. And we have testimony – you know, they clearly believe that our witnesses are not credible. But the credibility determination is exactly why plaintiffs have a constitutional access to a jury. And so I think it's pretty unfair to deny that we have any damages whatsoever. What's your best evidence that California would not have canceled the contract as it did? So there's a couple of different things. One thing I would point the court to is Michael Wong's personal notes. He's a California procurement officer. These are JA 2892 to 2894. And one of the things he says on March 27th, which is a day after all of this, is, you know, he asks what should I do because we still have a contract with the vendor. You know, so the succession that California was going to cancel on the 26th is actually belied by what did in fact happen. But also there's a bunch of evidence in the record that were California witnesses who are adverse to us. Remember, California is on the hook for this if JPM wins it soon. California's witnesses are saying, look, if they had delivered the masks, we would have taken delivery of them. That's at 3012, I believe. One of the California procurement officers said, if they had delivered the masks that were promised, we would have taken delivery of them. Elsewhere in the record, it's at 1602, I believe. They say, look, we just wanted the masks as quickly as possible to, quote, save as many lives as possible. That's utterly inconsistent with the proposition that if we had shown up with 6 million masks using the money that we were supposed to have access to, that California would have said, nah, you know, we don't want them, we don't trust you. But I understand sort of the difficulties of kind of figuring out a hypothetical world. But if I'm just remembering the facts right, this all goes down maybe on March 26th or something like that, the money gets wired back. And then there are further negotiations with California. It seems like if California was interested in going forward, they could have gone forward. They could have said, all right, we'll give you back some of the money. Give us some of the masks. And they didn't do that. They called the FBI. Like, it just seems as though California, for whatever reason, really did not want to go forward with this. I think what we're going to end up debating, not to cut to the chase, is the proper inferences to be drawn from these pieces of evidence, because we view them very differently. You know, in our view, California cancels because it has lied to about whether or not the money had already been credited to our account. There's evident surprise from officials in California that the wire transfer, you know, when Chainbridge tells them this wire transfer has not been completed, that that's actually true and that they're still in a position to take the money back. And we think if we had had possession of the money, it was in our account, we would have ended up talking to California, which is what we needed to do about what would happen next. And we could have showed them that Suchi had the masks and was ready to deliver. I mean, there's a lot of aspersions cast on us in the briefing, but if you actually read the exchanges with California, Mr. Thomas is really up front. He says, I will show you the text messages with my supplier in China, if you want to see them. We need to get prepayment because everyone is asking for a prepayment. And I'm sure he would have offered to connect them directly to Suchi. We are talking about a hypothetical universe that is undermined. I hear what you're saying, and I know you're not saying this, but there is a perilously fine line between what you are saying and, look, if we'd still had the money in our account, maybe California didn't want to deal with us anymore, but we would have had a whole lot of leverage, and we would have been in a way better bargaining position for kind of cramming a bad deal down California's throat. If we, you know, possession is nine-tenths of the law, it would have cost them a lot of money to come get it. That obviously can't, I think, that's not what you're saying, and that can't be a theory of damages, right? So tell me, give me the dividing line. You understand my concern. Yes, what we wanted was an opportunity to perform on the contract. And we had six million masks. This evidence is not disputed. All the evidence is in our favor, that the first six million masks, they were in New Jersey from a supplier in New Jersey. They didn't have to come from China, that they were in their live inventory, and that they were ready to be shipped the next day. And we have a signed purchase order with that company, Suchi. That's at JA1767 and 68. And it's countersigned. They've agreed to deliver. Can we summarize this? Because we've let you go over somewhat here.  So is it correct to say your best argument here is there's a disputed issue of fact on whether California would have let us perform if we had the money and would have sent them the six million masks? Is that your best argument, that there's a factual dispute here? That's more or less exactly right. If Chambers Bank had not scuttled the contract, if we had had the money and were able to wire it out to our supplier, which is what the plan was, we would have performed on those six million masks. And I think at that point, everything would have been different because California would have sued. Thank you very much. I'm sorry, just one quick follow-up question. If that's the argument, if it's about the six million masks, I mean, your colleagues on the other side say this was not squarely really raised in the district court, the kind of partial performance argument. And I did look through the record and I see it in like the last sentence in a footnote on the last page of the, I think it's your reply in support of your motion for partial summary judgment. But boy, if there was ever a passing shot, that kind of looks like it. What's your response to that? I think actually if you read all three pages from page 18 to 20 of that filing, you will see a developed argument that we have, that the dispute is about the amount of our damages and that they don't actually have the ability to show that we have no damages at all. And in any event, the district court knows that it needs to find the legal element of no damages whatsoever.  We've been very liberal on the time, so you've got some rebuttal and we'll now hear from Mr. Schoenfeld. Thanks very much, Your Honor. Alan Schoenfeld for JPMorgan Chase. Judgment should have been entered for JPMorgan on Chambridge's indemnification claim because Chambridge, not JPMorgan, canceled the wire. Chambridge made repeated efforts to get the wire off of its books and out of the bank, first with California, then with JPMorgan. JPMorgan ultimately acquiesced and accommodated that request. That's not remotely the scenario contemplated by Section 211F, and Chambridge has no right to indemnification under it. The right to indemnification under Article 4A belongs to a receiving bank that agrees to cancellation, quote, by the sender. But your bank did send a request for the money back. The bank sent a... I'm sorry. Your bank sent a request for the money back to Chambridge Bank, correct? Correct. It sent what's called a Fedwire Confirmation Code 1001, which is a request for reversal. It sent that only after the CEO of Chambridge Bank requested the reversal himself. And so if the transmission that JPMorgan Chase sent, that request for reversal, constitutes the cancellation, then so does the request from Chambridge, which came earlier. Article 4A defines cancellation to be a communication, oral, electronic, or in writing, for a particular act to be taken. And so to the extent that the court deems that confirmation, which we view as the effectuation of the accommodation that JPMorgan was granting to Chambridge, the same can be said, and the same is true. So when you sent your communication to Chambridge, it could have said simply no indemnity. It certainly could have. That's a possibility that was available at the time. But as we try to explain in our briefs, the idea that indemnification under 211F was triggered at that point in time, given the course of performance between the parties, I don't think was on anyone's mind at that point. 211F is clear that it applies in a particular set of circumstances, factual circumstances. It's meant to be narrowly construed, as all statutory rights to indemnification are. And the idea that in the circumstances where Chambridge Bank was repeatedly attempting to get the money off of its books, calling California twice, then calling JPMorgan Chase, then explicitly saying, can you send a request for reversal and take this money back, the idea that indemnification... But what JPMorgan had to say was no. No indemnity or reject the request? Either one. Well, JPMorgan was happy to accommodate the request by Chambridge. It was happy to send the request for reversal and have the money communicated back to the bank. But to answer your earlier question, Judge Agee, the idea that they would put no indemnity in factual circumstances where I don't think it was in anyone's contemplation at JPMorgan Chase or at Chambridge, as reflected in the 143 call, the idea that it would disclaim something... What difference does it make in that circumstance? You asked for the money back after you'd sent it, and they sent it to you. Why doesn't that end it? So the language of 211F, I think, forecloses indemnification under those circumstances. The language refers to only a particular set of circumstances where the receiving bank agrees to cancellation by the sender. Very simply put, the cancellation here was not by the sender. I understand your Honor's focus on the request for reversal, but again, if you look at the circumstances and the statute requires you to look at the course of performance here, what that request for reversal was doing was accommodating the request by Chambridge for JPMorgan Chase to recall the funds. That was the cancellation. And so, you know, our legal position is that this was not a cancellation by the sender, but instead was a cancellation by Chambridge Bank, which there is the receiving bank. And the sender here is who? The sender of the wire is JPMorgan Chase. I think everyone agrees that for purposes of the 211F analysis, JPMorgan Chase was the sender, the originator. So you sent the money, and you asked for it back. I'm still not understanding why that's not a cancellation. I think where I take issue with your description is that we... I'm just asking a question. No, no, I understand, but I think implicit in what you just said is that we sent it, and then we asked for it back. I think that the legally operative cancellation was the oral request by Chambridge to return the funds to JPMorgan Chase, which sort of flips the 211F paradigm on its head. I understand that, and I concede the record shows, that JPMorgan Chase then, pursuant to its agreement with Chambridge to honor that cancellation, it then sent the formal Fedwire transmission. So what's the agreement? I'm sorry? What in the record establishes a pre-existing agreement between Chambridge and JPMorgan that Chambridge wants the money gone, and you agreed to send it to honor their request? So I think the evidence in the record is the conversations between Chambridge and the JPMorgan Chase personnel, where Chambridge says, can you issue a reversal request? JPMorgan Chase first says no, and then three minutes later calls back and says, we're prepared to issue the reversal request. What do you need from us? That's the agreement to return the payment order, and that's the agreement. But as we view the facts, that is JPMorgan Chase accommodating a cancellation that was initiated and effectuated by Chambridge Bank. That's not exactly the way the conversation goes, right? It's that they call back and say, we're going to be recalling those funds, okay? We have enough concerns that we feel we need to call those funds back. Precisely, and I think everything that was said – It's not precisely what you said. Well, so I was paraphrasing. I apologize. But I grant everything that you said, that's in the record. The request was from Chambridge Bank to Rakesh Kaurpal, or to Tim Coffey who conveyed it to Rakesh Kaurpal, who was the decision maker. He then directs Tim Coffey to call back and say, we're willing to grant this request. It doesn't say we're willing to grant your request. It says we have enough concerns that we are going to call this money back. Absolutely, and however he characterized it, it was an agreement to Chambridge's request. It was an accommodation. I think the official commentary section, or paragraph 5, I think gives some texture to exactly what goes on in these circumstances. In the ordinary course, it's the receiving bank that has risk to its beneficiary, blue flame here, because the money has gone into the account, or the assumption is that the money has gone into the account. And the question is whether the receiving bank is going to honor a cancellation by the sender understanding that it faces the risk, reputational, the risk with its customer, and the risk of liability. There's no need for that here when Chambridge wants the money and is actively pursuing getting the money off of its books and returning it to JPMorgan Chase. There's no reason for there to be indemnification because it is bearing the risk, knowingly bearing the risk, of returning the money to the sender. It seemed as though the point of this provision was just like, let's have a bright line rule. We don't care how the parties got to the point where JPMorgan was requesting the money and Chambridge was giving it to them per your request. Like, we don't care what got us to that point, but now we have the request and we have Chambridge acceding to the request, returning the funds per your request. That's what we need to know. We're done. Honestly, not the right reading. I disagree, and so I think there's textual evidence that that's not the case. The first is unless otherwise provided an agreement of the parties, which requires some contemplation of what the parties actually agree to. And Article 4A is clear that agreement is distinct from a contract, so you always need to look at the course of performance, the course of conduct. What was the benefit of the bargain in fact is the language of Article 4A. It then otherwise provides if you agree to cancellation. And, again, the use of agreement there contemplates that there are going to be factual circumstances where the court needs to inquire as to exactly, as you said, how you got there. And this is one of those rare cases where the court needs to do it. In the mine run of cases, there's not going to be a dispute about these facts. I guess I don't understand your agree argument, your textual argument about the word agree, because even on your account there was an agreement here, right? There was an agreement. There was, and there was an agreement, but the question is whether the cancellation. More than one person can agree. So there was an agreement. The other textual sort of piece of this is a cancellation by the sender. And I think that's where we differ with Chambridge, which is the cancellation here was not by the sender, but instead the cancellation was by the receiving bank. And in those circumstances, on the face of 211F, and as confirmed by the commentary, which, again, commentary isn't like legislative history. It's not just sort of people weighing in with general views about these things. It's meant to be given some deference, as the Supreme Court said in Ford versus Mulholland, because this is the expert, explicative analysis of how this is meant to play out in particular factual circumstances. So what do you, how about the Second Circuit case, Banco Commerciale Italiano? That seems to take a pretty ritualistic, if you want to use that word, view of the indemnification provision that would not appear to support your client's argument. What do you think? I disagree. The issue in Banco Commerciale is whether, under New York State law, you imply a three-year statute of limitations or a six-year statute of limitations. And the question is, is the cause of action, which there was 211F, you're suing under, one that's created by statute. And what the Second Circuit says is this is created by statute. This is an automatic right to indemnification where the requirements of 211F, cancellation by the sender, are met. And it differentiates it from common law causes of action for fraud or unjust enrichment. I don't think we have any dispute with Chambers about any of that. And the only reason that I think Chambers invokes Banco Commerciale is to say, well, you should reject the sort of common law construct of indemnification and any suggestion that common law indemnification law matters here because the Second Circuit said that this was a creation of statute for purposes of whether the three-year statute of limitations applies. I have no disagreement with anything the Second Circuit said in that case. I just think it's beside the point. We don't dispute that absent this statute, this right to indemnification wouldn't exist. And we don't dispute that when the requirements of 211F are met, indemnifications don't matter.  We've let you go over quite a bit, too. So you've got some rebuttal time. And we'll now hear from Mr. Orsek. Thank you, Your Honor. May it please the Court, I'm Gary Orsek for the Chainbridge Defendants and Appellees. I'd like to address Mr. Citron's arguments first, and then I will turn to Mr. Schoenfeld's arguments. There are three sets of claims that the Plain of Blue Flame brought here, and it's helpful to distinguish them because I think they've been blurred a bit. The lead argument the appellant presents is the claim under Section 204A, which applies, and I'm quoting here, where a receiving bank accepts a payment order issued in the name of its customer as sender. So the cases that were before the District Court, the only ones we're aware of, address the specific circumstance where a bank, such as Chainbridge, receives a payment order that purports to come from the customer, but really doesn't come from the customer. Everyone's familiar with that species of fraud. And 204A draws a pretty bright-line rule that if the bank, without doing proper due diligence, sends out the customer's money in that circumstance, it is liable for the amount of the wire. And that's what was pled by the plaintiff here. And that's why the District Court quite specifically held that the Section 204A claim fails because Chainbridge did not accept a payment order from anyone, let alone a payment order issued in the name of the customer as the sender. Instead, as the complaint alleges, Chainbridge sent out the money in response to this non-value request for reversal from J.P. Morgan, which everyone agrees is not a payment order. It's also why Blue Flame's trial counsel conceded at the motion-to-dismiss stage, and again I'm quoting, that if discovery establishes that defendants accomplish their unauthorized return of the funds by accepting a cancellation request made by California's bank, Blue Flame agrees that this count would not survive upon a motion for summary judgment. So is that, by quoting that particular wording, that's your basis to say that under 204A, a cancellation process cannot by definition be a payment order under 204A? That's right. And that is a non-disputed point. I can point you to Joint Appendix page 1288, which pursuant to the Federal Reserve Bank's Operating Circular 6, defines a cancellation request as not a payment order. So is it your view that that concession by Blue Flame effectively ends its 204A argument? I do, but I want to amplify that a bit. I'm not asserting it solely on the basis of the technical doctrine of waiver or forfeiture, although certainly it is that, because that's what counsel said. I also want to make the point that trial counsel for Blue Flame was exactly right. He got the law right. And now on appeal, and at the summary judgment stage, as Judge Brinkema observed, counsel tried to walk back what had been said at the motion to dismiss stage. But the district court held, in its opinion, what trial counsel conceded is, quote, precisely what the evidence in the record shows, which is that no payment order was received, certainly not purporting to be in the name of Blue Flame as sender. Counsel, can I give you a chance to respond, I guess, to the question your colleague started with? If that's right, that what happened here or something like this can't be covered by 204A, and if, as everyone is assuming, I guess you can only get consequential damages under 404A, what is the remedy if, instead of sending the money back to J.P. Morgan here, they had just taken all the money out by wire and put it in the bank president's account? I'm glad you got to that, Your Honor. First of all, what we asserted as preemption and what the district court found as preemption was section 404A, not section 204. So the premise in their brief that if 204 doesn't apply, then how could it possibly preempt state law causes of action? They're right, but it's a fake premise. There are all manner of provisions in the UCC that don't apply on these facts and that, therefore, are not preemptive of state law. To your question, if Chambridge Bank or any other bank just invaded its customer's bank account and sent the money off to a Swiss bank account somewhere, that's not covered under Article 4A of the UCC. Even if they do it by wire, it's still not covered. It's still not. It's still not covered. What is covered by 404A and what we asserted as preemptive and the district court agreed is that if a bank receives a wire and it accepts the wire, which happens automatically under the UCC, and then upon demand of the customer it fails to pay it over, why then the plaintiff has a cause of action as this plaintiff did under 404A. Judge Brinkman did not say they didn't have a cause of action under 404A. The court just concluded that they didn't prove damages, quote, resulting from Chambridge's breach. But that's your position, right, that you can only get consequential damages for the 404A? How are they supposed to get their money back? They're not. They don't get the money back. I mean, this is not unusual. Even on our hypothetical, the bank just wires the money to a Swiss bank account. They don't get their money back? All they can get is consequential damages under 404A? No, my point, I'm sorry if I was unclear. I'm just asking, how do they get their money back? What's their cause of action for I want my money back from that Swiss bank account? If 404A doesn't apply because the money did not come into Chambridge Bank from a wire. So, Your Honor, if you have a bank account and your bank decides to send your money or wire it out, you may have a conversion claim. A state law claim. A state law claim. You would have a state law claim. The reason they don't have a state law claim here is because it is preempted by 404. 404 speaks directly to this. They had a live 404A claim. And by the way, 404A says that upon appropriate proof, they are entitled to damages resulting from the breach of 404A. It mentions consequential damages as well, but it uses tort law language of damages resulting from it. So you think that you could get your money back under 404? You could. Just didn't ask for it? No, no, that's not right. Okay. They didn't. They forswore it as a matter of fact, but there may well be circumstances where the amount of the wire is damages resulting from the breach under 404A. For example, suppose Blue Flame had delivered 100 million masks already to California and then Chambridge received the wired funds and didn't pay it over to them. And they had a 404A claim. I suspect they could have adduced proof that those are damages, the full amount of the wire are damages resulting from the failure to pay because they would have to pay their suppliers. They would have lost profits. In this instance, as I will get to if I have the time, there is no evidence of any of those types of damages. Mr. Orsik, on that point, on the damages, again, as I ask your opposing counsel procedurally, you want summary judgment. What was the evidence in front of the district court about the damages and why do you believe there were no material facts in dispute regarding those damages to conclude zero? Thank you, Your Honor. Yes, that goes to the 404A claim, which is count one. I was going to get to it next, but since you asked, I'll get to it now. The district court cited what it called two equally compelling and independent reasons why Blue Flame failed to adduce any evidence of damages, and Judge Agia alluded to some of these in the questioning. The first is California made excruciatingly clear as soon as it learned that the principles of Blue Flame had never been in the medical supply business, were political operatives, and had opened a bank account at Chain Bridge two days before, that it did not wish to go forward. And I'll just cite you a couple of the sites that the district court relied on. First, the deposition of Mr. Corpall, who was the head of fraud prevention at J.P. Morgan, testified that the recall of the funds by J.P. Morgan corresponded with a 2 p.m. request from the California State Treasurer, this is on March 26th, that J.P. Morgan recalled the funds because the California Treasurer's Office was not comfortable with the due diligence that had been performed. And that same day... Who's saying that? That is Mr. Corpall, K-O-R-P-A-L, of J.P. Morgan. He's the J.P. Morgan guy. Yes. But there's evidence directly from California as well. Mr. Sturmfels from the Department of General Services said that same day, quote, after further discussion, we won't be moving forward with this vendor. That's in the joint appendix at page 3078. And that was on the 26th as well? That was on the 26th. And then immediately thereafter, this is more circumstantial evidence, but it all goes in the same direction. There are repeated expressions of thanks and gratitude by California to J.P. Morgan for helping to reverse this transaction. I can cite you to JA1374 in particular and also JA1371 where California said, the state is extremely grateful for J.P. Morgan's leadership and the steps we took to get this money recovered. So in other words, we don't have to imagine and guess what a counterfactual might look like, which is Mr. Citron's argument. It should be up to the jury to decide the counterfactual. We have the factual here. California learned the truth about this plaintiff business and immediately and emphatically declined to go forward. The second piece of evidence, Judge Grigsby, that the district court cited is that Blue Flame was tenacious and they, after the fact, sought to reinvigorate this transaction and sought to entice California to go forward. After all, California could have rewired the money. Blue Flame by then had a new relationship, they said, with Bank of America. But California declined to do it. As the district court wrote in its opinion, John Thomas' March 27th efforts to revive the deal by reaching out to Comptroller Yee were met with no interest. And with Yee telling Thomas that his company now had a, quote, credibility issue they would need to resolve. Joint Appendix 3048. Blue Flame then reached out to the Department of General Services separately. And as Your Honor alluded to, those communications were forwarded to the FBI. So there's, and I should add, that it is undisputed that under the terms and conditions that were incorporated into the transactional documents with Blue Flame, California, as most states would do, had an unfettered right to terminate the contract for any ground that it sought as necessary. So Blue Flame, as I understand the argument in the colloquy, says that it's undisputed it had six million masks in New Jersey. And all it needed was the money from the bank account and they would have shipped the six million. And that creates an issue of disputed fact as to whether California would have gone through with the rest of the contract or at least establishes partial damages. I think you've, I understood their argument the same as you did. The problem is what the district court found is that there's undisputed evidence going in the opposite direction. The court addressed this very point. The court acknowledged that Blue Flame had issued purchase orders to Suchi and this other company, Great Health Companion, but there's no evidence that the orders would have been or could have been filled by the suppliers at JA3085. And she explained the rationale for that. First, the court held, neither the purchase orders nor the reseller agreements included any delivery schedules suggesting that the product would arrive in time to satisfy the representations that Blue Flame made to California. There's no record evidence whatsoever that Suchi or this other company, which were just brokers, by the way, they were not manufacturers of masks. There's no evidence that they had any supply agreements with manufacturers. And I think most important to the district court, and I think which puts the nail in the coffin of this argument, is that neither of these putative suppliers, Suchi or Great Health, ever produced a single mask to anyone, ever. So, as I think you know from the record, Blue Flame was required to respond to congressional investigators after the fact, which posed questions to Blue Flame to list all of the contracts it had entered into with states and municipalities and then to state what came of those contracts. And of 24 for PPE generally, and 13, I believe it was, for N95 masks, all contemporaneous with this transaction, Blue Flame failed to produce masks to any of them except for these two very small ones that were filled significantly later. And I would note in this regard that as to one of them, Riverside University Health System, that was one of the would-be purchasers, Blue Flame wrote on April 29th, Great Health informed Blue Flame Medical that it could not deliver the N95 masks because of the actions of the Chinese government. That's at JA1124. Nothing was ever said under an obligation to tell the truth to Congress to try to lay this at the doorstep of Chainbridge or this transaction. So, the best evidence that the district court cited as to, I'm putting it incorrectly, let me state it otherwise, there is no evidence in the record which would have been Blue Flame's burden to come forward with in the face of our summary judgment motion. There is no evidence in the record that any of these putative suppliers could have produced any masks because neither of them ever did produce any masks. If I may, I wanted to, and I know we're jumping around a bit necessarily, I wanted to respond briefly to Mr. Citron's, I think, convoluted argument as to why Section 204 applies here. Because his argument is that the entire amount of the wire must be paid over as damages if 204A applies. As I explained, Chainbridge Bank never accepted any payment order, let alone one purporting to come from the customer as sender. The response to that, that counsel urges, is that Chainbridge Bank must have accepted, quote unquote, under the language of 204, the very order that it sent to Blue Flame to return the money. And for that proposition, they cite Section 209A, which says that a bank, quote, accepts a payment order when it executes the order. So in relying on that language, their argument is, by definition, you accepted a payment order because you issued a payment order. That is as wrong as it sounds, and it ignores Section 301A, which defines execution, and it says this. Can you go back? I'm having trouble following that. Can you go back to accepted a payment order from whom? Right. You're right to be confused. Chainbridge never accepted, let me put it more simply, it never received any payment order from anyone. Everyone concedes that. What Mr. Citron says is, as a matter of law, that can't be right, because under the UCC, there have to be two payment orders. Is that because the cancellation order, if that's what it was from J.P. Morgan, cannot be a payment order under 204A? It's true that the cancellation order cannot be a payment order. But the rest of this argument, the premise of it, is completely false. It is not true that every Fedwire transaction comprises two payment orders. To the contrary, the UCC at Section 4A-102, in the comments says, a funds transfer is made by means of one or more payment orders. And there was only one payment order in returning the funds here, and that was the one by which Chainbridge Bank issued the money back to J.P. Morgan. There was no first payment order at all. And so this legalistic but incorrect argument, citing 209A, is that by issuing the payment order, Chainbridge Bank magically must have accepted the very same payment order that it issued to J.P. Morgan. Section 301A, and the comment, which is even clearer, forecloses it. It says, the comment says, execution refers to the act of the receiving bank, in issuing a payment order, intended to carry out the payment order that the bank received. So in other words, if Chainbridge had received a payment order, and then issued a new payment order in response to the one it received, by issuing that second payment order, it would have accepted the first payment order. That's what 301 says, which they don't mention. And again, I've already addressed this. They say, well, there must be two payment orders, because the UCC says there must be two payment orders. But what they cite is one of those cases that are listed as examples in the commentary, and they pick a case in which there were two payment orders. But as we know from Section 211, which addresses the cancellation of a wire, there are transactions like this one, all the time, that consist of only one payment order. You get a non-payment order in from the bank requesting cancellation. Everybody agrees that's not a payment order. And then you issue a payment order. That's one payment order, and that's what happened here. The 204A claim, as fashioned by counsel on appeal, I regard as not colorable whatsoever. I've addressed 404. The district court's grounds were that there is no jury-submissible evidence of resulting damages. There was a question posed about partial performance. That was raised even later than Your Honor remembered. It was raised for the first time in a footnote in a reply brief after summary judgment argument, after summary judgment was closed in support of Blue Flame's post-summary judgment motion to allow the court to consider Mr. Huang's declaration, which the district court rejected, both because it was procedurally improper and because it was not helpful. So the partial performance doctrine was waived. But in any event, Judge Brinkham's opinion that there's no evidence that any masks could have been produced because, indeed, none were produced, I think disposes of the partial performance argument, even on the merits. Another argument that was never raised until now on appeal is that under the 404A claim, under 404A, the plaintiff is entitled to recover the full amount of the wire. That's another one that was not only waived by inaction but was affirmatively disclaimed by counsel below. That's all in our – well, it's not all in our brief, but counsel conceded it at JA3034. And in any event, the argument is simply wrong as the comment to 404A says that damages under 404A are addressed in the final sentence of 404A, which limits damages to resulting damages. I see that I'm about out of time, but I want to say one or two more things on Blue Flame's claim. Counsel, in fairness to you, we let both the opposing counsel go over, so we'll give you a couple extra minutes if you want. Thank you, Your Honor.  We argued in the district court, and I urge as alternative grounds for affirmance here, that Blue Flame is not entitled to invoke the remedies, any remedies under the UCC, because it has not complied with the obligation to pursue those remedies in good faith. Judge Brinkman did not reach that ground because she didn't need to, but her opinion, I think, finds the lack of good faith. She held that, and I'm quoting, Blue Flame's apparent initial misrepresentations to California authorities were recognizable. That's at JA3090. Counsel's only response to this point is to say that because the requirement to act in good faith appears in Article I, not in Article 4A, it doesn't apply to this case. That's incorrect, and I didn't have a chance to respond to this. I'm sorry, I thought their argument, and maybe that was one of their arguments, I understood their argument to be more along the lines of sort of the alleged bad faith here was sort of Blue Flame as to California, and that's sort of a separate and distinct set of transactions, and it doesn't really chain bridge. There was no bad faith as between Blue Flame and chain bridge, so why should chain bridge get out from under its obligations? We did cite evidence that there was bad faith as to chain bridge, which the judge didn't reach. When Mr. Gula opened the bank account, he affirmatively misled chain bridge about what the account would entail, but more to the point, there's nothing in the bad faith section that says the only disqualifying bad faith is bad faith perpetrated on the bank. If the bad faith would have precluded Blue Flame from recovering as against California, it makes no sense to allow them to pursue the same remedy against chain bridge, and in any event, the language of this section, 1-304, says every contract or duty within the UCC imposes an obligation of good faith in its performance and enforcement, and so our argument is they are seeking to enforce a right under the UCC as against us in a circumstance where they engaged in bad faith, and even if the bad faith were only as to California, it's the same set of circumstances. Is there something sort of intuitively appealing? I understand what you're saying, and I'm not making any assumptions about what happened here, but if the allegations are true, it does seem sort of odd to say you successfully defrauded California, at least for a short time, out of half a billion dollars, and now you want it back because there might have been some technicality in the way the money was wired, but are there any cases? Is there any authority for, and maybe this is just sort of an unusual set of circumstances. I tried to find a case that looked like this under the good faith doctrine, and I couldn't quite find one. I did as well, Your Honor, and on a number of these provisions, there is no case law. Helpfully, the commentary and the text are pretty clear, but I didn't find any either. I'm not going to say anything more about the state law claims other than to try to disabuse the panel of the notion that we or the district court relied on 204A, which was inapplicable, to preempt the state law claims. It was 404A, which the district court found was applicable, that preempted the state law claims. They don't appeal on defamation. On tortious interference, I'm going to stand on our brief. If I may have 90 seconds to address the indemnification. All right. Go ahead. Let's hold it to 90 seconds. Yes, Your Honor. The main argument that was made here is that as a practical matter, it was Chainbridge that canceled the wire, and so 211F can't apply. First and foremost, a receiving bank cannot cancel a wire. All you have to do is look at Section 211A, which defines it as a communication by the sender. There is no precedent and no sense that one has to look to the events leading up to the cancellation to decide who directed it. There is always an agreement before a return because Sections 211C and 211F make very clear that the receiving bank, that's Chainbridge Bank here, upon receiving a cancellation request, can return it or not return it. So anytime it's returned, there must be an agreement, and therefore the argument that if we agreed to do it, we must have wanted to do it and must have done it for our own reasons, and therefore indemnity doesn't apply. That would swallow up the entire rule. The comment says that indemnification is automatic. The Banca case says that it is absolute, and simply as a factual matter, the notion that we directed the cancellation is factually false. Thirty-five minutes after the original wire went from JP Morgan to Chainbridge Bank, Mr. Coffey from JP Morgan called up to report his, quote, concerns of fraud. Nine minutes later, 13 minutes later, Mr. Korpal called Chainbridge Bank, warning Chainbridge Bank that its global securities investigation was all leading to not good places. And then as Your Honor pointed out, at 1.37, Mr. Coffey called Chainbridge Bank to say, quote, we're going to be recalling those funds which you recounted already. And then at 2.05, they sent a formal cancellation request saying, as per remitter's request, please return the funds, quoting our reference. There was no agreement to displace indemnification. That was stipulated in the record, not by conduct, not by anything else. And the notion that our damages, which so far are only attorney's fees, and I hope it remains that way, are not damages or costs resulting from the return of the wire, is baseless. The whole premise of the lawsuit by Blue Flame is that we're suing you because you returned our money instead of giving it to us. That resolves the whole matter. Thank you very much. Thank you. So we've got rebuttal. First from Mr. Citron. So I don't think that I heard a response to the question how we're supposed to get the money back if they wire money out of our account without authorization. And I understand that they are now arguing that they didn't even purport to accept a payment order in our name. Instead, they just sent the money out of our account without any authorization or basis in law to debit it whatsoever. I do think this is best handled under the regulation itself. If you read Comment 1 to Section 204, it says that the premise is that the bank has to have a legal basis for taking a payment out of our account for the payment order, and it takes the risk of loss if it doesn't have a legal basis. And they do not argue that they had a legal basis for taking money out of our account. You cannot excuse that. I also think there's a couple of unfair things happening here in an effort to sort of bootstrap concessions that would allow them to wriggle out from the legal problems that they're creating. At the time of the motion to dismiss, it's still disputed whether or not the money had actually been credited into our account. And 404 is meant to cover the situation in which it's not credited into our account. And the 204 claim arises when we have the money, and they wire it out without authorization. The district court holds at summary judgment, and they no longer dispute that they actually had credited our account. And what they are saying now is that somehow our state law claim for conversion or fraud is preempted with respect to that illegal transaction, wiring money out of our account without any legal basis whatsoever. That cannot be right. As to partial performance, I just want to clarify what was happening in the district court because, again, I think it's really unfair. They moved for summary judgment on you don't have damages at all in addition to other theories. We moved for partial summary judgment on liability under 404A, saying they don't have any defense, and the dispute is about the amount of our damages, not whether we're damaged at all. And in our reply for that portion of the cross motions for summary judgment, we emphasize on page 20, this is a paraphrase because I don't have it in front of me, something like the page 20 of the reply, document 159, to the extent they are disputing the number of masks we were going to deliver in April, that goes to the amount of our damages, not whether we have damages at all. And then the district court knows what it has to hold. It holds there's no damages in any respect because it knows that that's the legal element of our claim. It doesn't think we've waived partial performance or say anything like that. You know, the best they say in their brief is we didn't focus the district court's mind on this issue. I don't think that's fair. This contract was obviously not $100 million or bust. The whole negotiation is that we're going to be delivering it in tranches, and we deserved the opportunity to perform. Judge Agee, you asked whether we asked for this relief. This is our Section 204 claim. The request is on JA-43. It's unambiguous. We asked for the money back, and we are entitled it. And Judge Grigsby, I think your question is right. You've got to focus on the procedural posture and the evidence in front of the district court. My friend points to their evidence and their preferred inferences, but we have our evidence too. And I just want to point to the most important piece. On JA-1557, Mr. Thomas testifies without contradiction that Suchi had 6 million masks in its live inventory that were ready to ship out the next day. There is no evidence on the other side with respect to that proposition. All they can say now is that he didn't offer sua sponte, the basis for his personal knowledge of that fact. But they were examining him, and they chose not to ask him any questions about that. It's not his responsibility to be like, oh, by the way, here's how I know that. At trial, they can try to prove that he's not a credible witness. Or we can put on Ms. Suchi, who will testify to the availability of the masks or not. But we're way out ahead of ourselves if we're trying to say that there's no prospect, based on the evidence in the record, that we have any damages whatsoever. So counsel, try to bring your argument to a close here. Yeah. Oh, one last thing. Judge Harris, you asked, you know, is your argument that if we had had the money, we would have had leverage and we could have extracted something? I just want to point to some evidence in the record that I think is really important. When we couldn't deliver, we have told California throughout this period, if we can't deliver, we're going to refund the money. And when we can't deliver masks to Tennessee as a consequence of what happened here, we don't just refund Tennessee all the money. We also refund them the credit card fee that we're not holding because they incurred it and that was the fair thing to do. There's all these suggestions that we're bad actors, but we weren't going to make a single dollar if we couldn't actually deliver the masks. That's what we wanted to do. We wanted an opportunity to bring together our suppliers with the funds that California had so that we could lock up contested inventory in the middle of a pandemic. This is March 2020. There's no certainty. The fact that Suchi, our great health companion, can't deliver after its big deal falls apart when a bank unexpectedly reverses a wire and illegally reverses a wire isn't surprising. Right? There is a global scramble to lock up these goods. And what they are saying is there's no way any reasonable jury could hold that you are damaged at all from their involvement. And I think that that is, you know, gratuitously unfair. Thank you very much for your argument, counsel. And we'll now hear Mr. Schoenfeld in rebuttal. Thanks, Your Honor. I will make it brief. I just want to make two points. The first one is that Chambridge's argument on cancellation, at least the legal argument, depends on the premise that a receiving bank can't cancel a wire transfer. That's not true. There's nothing in the statute that says that. 211F refers to cancellation by the sender. If it were the case that every cancellation is by the sender, that language would be redundant and it would be surplusage. Section 1105 and 1106 both define the functions of the receiving bank to include cancellation. JA 2940 is a Fedwire manual that describes the manner in which a receiving bank can derive a reversal of a transaction because, as Mr. Orsak mentioned, transactions conducted over Fedwire are automatically accepted. You can only be talking about a cancellation there. It's not a rejection. So there's no evidence on the face of the statute or in the record to support the starting premise of their argument that cancellation can never be done by a receiving bank. The second and last point I'll make is Mr. Orsak suggested that it's stipulated in the record that there was no agreement between the parties to provide otherwise, as the Prefatory Clause of 211F suggests. We point the court in detail in numerous respects, the course of performance between the parties culminating in the 143 internal call between the Chambridge personnel about the wire. What was said, what was not said, and then what was confirmed in that call suggests, at the very minimum, that there's a disputed question of fact as to what the agreement of the parties was. What the benefit of the bargain, in fact, as to precisely how this transaction would be reversed and whether indemnification was part of that bargain. And it's for a fact finder to determine whether, in fact, the parties agreed or provided otherwise through their course of performance. Thank you very much. All right, thank you. We appreciate the argument of all counsel in this case. And as you probably know, our practice is to come down into the well of the court and greet counsel personally. But COVID still has us restricted in that regard. So we hope you'll return on a future occasion when we're able to do that. So the court will now take a short recess. And, Rachel, if you'll come back when we get there. This honorable court will take a brief recess.
judges: G. Steven Agee, Pamela A. Harris, Lydia Kay Griggsby